# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00256-CR

**Ray Recio Cortez, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 119TH JUDICIAL DISTRICT
### NO. B-04-0897-S, HONORABLE BEN WOODWARD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Ray Recio Cortez entered a non-negotiated guilty plea to the first-degree felony of aggravated kidnapping.[1] *See* Tex. Penal Code Ann. § 20.04 (West 2003). The district court adjudged him guilty and imposed an eighty-year prison sentence. In two issues, appellant challenges the factual sufficiency of the court's finding that he did not release complainant in a safe place and argues that the court abused its discretion by sentencing him to eighty years' confinement. We affirm the district court's judgment.

---

[1] At the same proceeding, appellant pled guilty to two other pending indictments, unrelated to this case, involving theft from a person and forgery of a financial instrument. *See* Tex. Penal Code Ann. §§ 31.03, 32.21 (West Supp. 2006).

## BACKGROUND

After being indicted by a grand jury for the first-degree felony of aggravated kidnapping, appellant pled guilty and executed a stipulation of evidence in which he admitted that he intentionally and knowingly abducted complainant by threatening to use deadly force. During sentencing, the court heard testimony from several witnesses: the security supervisor for Wal-Mart Supercenter in San Angelo, the complainant, the motorist who assisted complainant, a San Angelo Police Department detective, and appellant's mother.

Diego Castro, security supervisor for the Wal-Mart Supercenter in San Angelo, testified that the store has a video-surveillance system, which includes security cameras positioned toward the parking lot. He testified that he made a videotape recording of the event that occurred on June 24, 2004, in the store's parking lot and gave it to detectives from the San Angelo Police Department. The court admitted a copy of the videotape into evidence.

When complainant took the stand, the court played the videotape, and she identified the images of herself, her car, and appellant in the parking lot. She testified that she was a twenty-three-year-old college student who worked at Wal-Mart as a cashier and was shopping there on the date of her abduction. She completed her shopping sometime after 6:00 p.m., returned to her car in the parking lot, opened the driver's side door, and seated herself in the car when appellant confronted her. As he got between complainant and the open car door, he told her that he had a gun and that he would use it if she screamed. Complainant believed that appellant did have a gun because she could see the outline of something when he patted near his waistband; she denied that he ever tried to show her that he did not have a gun. Appellant told complainant that he wanted all her money,

2

and he forced his way into her car by pushing her to the passenger's seat. He then drove her car out of the parking lot.

Complainant stated that as they drove away, appellant asked for her purse and how much money she had with her. When she informed him that she only had $20, he told her that they were going to drive around until after dark and then they would go to an automatic teller machine (ATM) to withdraw her money. Complainant recalled that her car was low on gas, but appellant did not want to stop anywhere in San Angelo and risk having her seen by someone she knew. Appellant began driving toward Mertzon, a town that was unfamiliar to complainant.

Complainant stated that at one point, appellant drove the car off the highway and onto a dirt road to search through her purse, but afterward, he returned to the highway and continued driving toward Mertzon. Appellant asked her if there was anything wrong with her car because he did not want to be "pulled over." He told her that if she tried "anything funny," he would drive to a field that was on the left side of the road and kill her. During cross-examination, complainant confirmed her testimony about this threat, stating that although appellant said he would not harm her, he had previously "pointed to a field and said he was going to shoot [her]."

As they approached Mertzon, appellant asked complainant whether she had anything that could be used to tie her to the car when he stopped for gas. He had her take a lanyard—a cord worn around the neck that held complainant's school identification badge—that was hanging from the car's rearview mirror and tie her right wrist across her body to the gear shift. Believing that she had not tied the knot tightly enough, appellant tightened it. Complainant testified that her wrist was tied so tightly that it began to cut off circulation to her hand.

3

When they arrived in Mertzon, appellant stopped at a gas station and took the keys from the ignition. Before paying for the gas with complainant's $20, he told her to "keep [her] eyes on him at all times, otherwise he would come right out because [she] couldn't get very far from him." Complainant described appellant's demeanor during the drive to Mertzon as "very authoritative" and "very forceful," and she said she did not know what he was going to do to her. During the minute or two that appellant was inside paying for the gas, he was watching her.

After paying for the gas, complainant recalled that appellant returned to the car and started driving back to San Angelo. As he was driving, appellant untied complainant's wrist and began conversing with her. He asked her questions about herself, asked her to look at him so that she "would be able to identify him" whenever she got away, and told her that he had been to jail before. He told complainant that he needed money for drugs and that she was "just in the wrong place at the wrong time." Occasionally, he touched complainant's leg. Complainant testified that she was scared and crying and thought he might kill her.

It was almost dark when appellant and complainant arrived in San Angelo in search of an ATM. While they were stopped at a red light, appellant made complainant kiss him because she "looked too scared" and because people who saw her would think something was wrong. Appellant drove to a downtown bank where complainant attempted to withdraw money. When the bank did not accept complainant's debit card, they continued on to San Angelo State Bank. Once there, appellant leaned his seat back and had complainant crawl over him from the passenger side to use the ATM. Complainant testified that as she did so, appellant put his hands inside her shorts,

over her underwear, and touched her buttocks.  The ATM dispensed the $100 she had withdrawn, and appellant took the money and the receipt from her hands.

Appellant then drove to two houses in an attempt to purchase drugs.  Complainant recalled that the first was a house "behind the Grande Hotel on Chadbourne."  He parked the car on the side of the road against a tree so that complainant could not open the passenger's side door.  Then he exited the car and talked to some people while he stood next to the driver's side door.  Getting back in the car, he told complainant that they did not have what he needed.  He drove to another house "by 16th Street."  Appellant parked the car with the passenger side facing a house that was between twenty and fifty feet away.  He got out of the car, walked a few steps to the house, and talked to some people while he stood outside.  They yelled something at him and asked his name as he walked back to the car; he gave his name, got in the car, and "sped off."

Complainant testified that after they left the second house, appellant asked whether she had anything in the trunk of her car that could be used to tie her up.  Appellant told her that "he wasn't going to just let [her] go so he could be caught in fifteen minutes and go to jail."  When asked whether appellant told her that he was going to let her go after he had gotten his money and the "dope," complainant stated that he told her "he was going to let [her] go, but it wasn't going to be easy for anyone to find [her]."  Complainant stated that she tried to think about how to get away from appellant.  She denied trusting him to release her in a safe manner.

Meanwhile, appellant drove downtown to Martin Luther King Boulevard and stopped at a bar, parking the car about ten feet from its door.  Complainant saw him walk to the bar and talk to some people at the door, with the door still open.  Appellant returned to the car and told

5

complainant that "[they] were waiting on this guy because he was going to take [them] to where he could get his drugs." Complainant said that appellant stood outside for another minute but then he returned to the bar. He walked inside, and complainant saw the door close behind him. She denied that the keys were in the car when he went into the bar.

As soon as complainant saw the headlights of an approaching vehicle, she "jumped out of the car and ran into the middle of the road," attempting "to get away" and thinking that appellant might come after her. She testified that she was "not at all" familiar with this part of town. Crying and screaming, she got the attention of a passing motorist. Complainant stood in front of the truck that pulled up and began banging on the window, saying that she "had been kidnapped and the guy was right there at the bar." The driver said that she would follow complainant and told her to run toward an alley. Complainant did so and found refuge at a house. The police went to the house, and complainant accompanied them to the police station where she made a statement and identified appellant from a set of photographs.

The driver who assisted complainant also testified. Tonya Taylor was driving to the Chicken Farm Art Center where she resided and worked, located on three-and-a-half acres across the street from the bar. Taylor observed that complainant was running in the street without any shoes and waving her arms high in the air. She testified that complainant kept looking over her shoulder and was "sort of hysterical"—screaming and crying, banging on the truck's window, and trying to get into the passenger door of the truck. Taylor testified that she did not roll down her windows or open the door because she did not know the situation. She yelled to complainant, through the truck's rolled-up window, directing her to go across the street to an alley. Taylor knew

6

the alley was a one-way driveway and thought she could follow complainant, placing the truck between complainant and harm's way. Taylor stated that she saw someone watching from the porch of the bar but no one followed her. Taylor saw complainant run across the street, onto the art center property, and toward the residence of Taylor's supervisors. Taylor testified that the art center property was pretty well-lit, but she also stated that when in this area, she was "always very cautious, particularly with that bar area there."

Detective Jaime Padron of the San Angelo Police Department testified about his involvement in the investigation of complainant's abduction. He stated that after appellant's photograph was released to the media, the Ballinger Police Department notified him that they were detaining appellant. When Detective Padron took appellant into custody, appellant told him he had one thing to say, "I did not have a gun and I did not hurt her." Detective Padron testified that, after being arrested and advised of his rights, appellant gave a voluntary written statement to the police. The court admitted appellant's statement into evidence, in which appellant denied having a weapon, tying up complainant, or touching her inappropriately. He further stated that on the day of the offense, he needed money for drugs. He admitted that he tucked a water bottle into his clothing and told complainant that it was a weapon. His statement also says that he repeatedly assured complainant that he would not harm her.

Irma Cortez, appellant's mother, testified that she was disabled, needed her son, and did not want him to receive a long prison sentence because she thought she would not "be here much longer." On cross-examination, Cortez admitted that appellant's drug problem had worsened, stating "the drugs have gotten deeper."

7

After accepting appellant's guilty plea and hearing the witnesses' testimony, the court assessed punishment at eighty years' confinement in the Institutional Division of the Texas Department of Criminal Justice. Appellant filed a motion for new trial, alleging that there was insufficient evidence to support his conviction. The motion was overruled by operation of law, and this appeal followed.

## DISCUSSION

**Factual sufficiency**

In his first issue, appellant argues that the evidence is factually insufficient to support the court's finding that appellant did not release complainant in a safe place. During the punishment phase of a trial for aggravated kidnapping, a defendant may raise the issue as to whether he voluntarily released complainant in a safe place. *Id*. § 20.04(d) (West 2004); *Ballard v. State*, 193 S.W.3d 916, 918 (Tex. Crim. App. 2006). If the defendant proves the issue in the affirmative by a preponderance of the evidence, the punishment range for the offense decreases from a first-degree felony to a second-degree felony. Tex. Penal Code Ann. § 20.04(c), (d); *Ballard*, 193 S.W.3d at 918.

We question whether this issue is properly before us. At trial, appellant did not raise the issue of whether he voluntarily released complainant in a safe place, nor did he offer any evidence in support of that issue. The State did not have the burden to "disprove" whether appellant voluntarily released complainant in a safe place; it was required only to introduce evidence showing appellant's guilt and supporting the court's judgment of conviction. *See* Tex. Code Crim. Proc. Ann. art. 1.15 (West 2005) (requiring State to introduce evidence of defendant's guilt when

8

defendant pleads guilty to felony offense). However, in the interest of justice, we will consider appellant's first issue.

In a factual sufficiency review, we view the evidence in a neutral light and ask whether a fact finder was rationally justified in finding guilt beyond a reasonable doubt. *See Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). Next, we determine whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Id*. at 415. Unless we can conclude with some objective basis in the record that the great weight and preponderance of the evidence contradicts the jury's verdict, we will not reverse a case on a factual sufficiency challenge. *Id*. at 417.

Appellant contends that the evidence that complainant was not released in a safe place is too weak to support the trial court's finding and that evidence to the contrary is so strong as to create a manifest injustice. He contends that, when he entered the bar, complainant was unrestrained in her own car, which was parked in front of a well-lit tavern on a public street and near a well-lit art center, and that he did not follow complainant after she exited the vehicle.

We disagree with appellant's assertion that he voluntarily released complainant in a safe place. The record does not show that appellant "voluntarily released" complainant; it shows that complainant escaped from the car. Her escape from the car is not the equivalent of her being released by appellant. *See Ballard*, 193 S.W.3d at 919 (favoring narrow definition of "voluntary release," which excludes rescue or escape). Additionally, nothing in the record demonstrates that appellant made complainant aware of her "release." To trigger the voluntary release provision

9

of section 20.04(d), the accused must have performed some overt and affirmative act informing the victim that she has been fully released from captivity. *Id*. Moreover, a rational trier of fact could have found that the location was not a "safe place." The record shows that appellant left complainant without car keys, in front of a bar, at night and in an area of town that was not at all familiar to her. Taylor, who knew the area, testified that she was "always very cautious, particularly with that bar area there."

After considering all of the evidence in a neutral light, we conclude that the court's refusal to find that appellant released complainant in a safe place is supported by factually sufficient evidence. *See id.* We overrule his first issue.

**Excessive sentence**

In his second and final issue, appellant asserts that the district court abused its discretion in sentencing him to eighty years' confinement. He contends that the court refused to consider his drug addiction as a mitigating factor for sentencing purposes and that this refusal was based on the "false principle" that his addiction was a voluntary condition, not a disease.

The court violates due process of law if it assesses a predetermined sentence, arbitrarily refuses to consider the entire punishment range, or refuses to consider mitigating evidence when determining punishment. *See McClenan v. State*, 661 S.W.2d 108, 110 (Tex. Crim. App. 1983), *overruled on other grounds*, *De Leon v. Aguilar*, 127 S.W.3d 1, 5 (Tex. Crim. App. 2004); *Buerger v. State*, 60 S.W.3d 358, 364 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd); *Cole v. State*, 931 S.W.2d 578, 579-80 (Tex. App.—Dallas 1995, pet. ref'd). When reviewing a trial judge's determination of the appropriate punishment in any given case, we afford the trial judge a great deal of discretion. *Jackson v. State*, 680 S.W.2d 809, 814 (Tex. Crim. App. 1984). Ordinarily,

10

a sentence that is within the proper range of punishment prescribed by the legislature will not be disturbed on appeal. *Id.*; *Nunez v. State*, 565 S.W.2d 536, 538 (Tex. Crim. App. 1978).

Appellant did not complain during sentencing or in his motion for new trial about the court's statements concerning his drug use. His failure to object waived any error. *See* Tex. R. App. P. 33.1; *Cole*, 931 S.W.2d at 580; *Cole v. State*, 757 S.W.2d 864, 866 (Tex. App.—Texarkana 1988, pet. ref'd). Even if that issue had been preserved for our review, appellant's sentence did not exceed the permissible range of punishment for his offense. Appellant pled guilty to the first-degree felony of aggravated kidnapping. *See* Tex. Penal Code Ann. § 20.04. Under section 12.32(a) of the penal code, the punishment for this offense is imprisonment for a term ranging from five to ninety-nine years or life. *See id.* § 12.32(a) (West 2004). The assessed punishment of eighty years' confinement is within the permissible range for appellant's first-degree felony. Consequently, we cannot say the trial court abused its discretion. *See Jackson*, 680 S.W.2d at 814; *Nunez*, 565 S.W.2d at 538. We overrule appellant's second issue.

## CONCLUSION

Having overruled both of appellant's issues, we affirm the district court's judgment.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Affirmed

Filed: May 30, 2007

Do Not Publish

11